1
2
3
4
5

Jennifer F. Novak (SBN 183882)
Email: novak@jfnovaklaw.com
LAW OFFICE OF JENNIFER F. NOVAK
500 Silver Spur Road, Suite 206
Rancho Palos Verdes, California 90275
Telephone: (310) 693-0775
Facsimile: (310) 957-2624

Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

Attorneys for Plaintiff Orange County Coastkeeper

6
7
8
9
10
11
12

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

13
14
15
16
17
18
19
20

ORANGE COUNTY COASTKEEPER, a California non-profit corporation;

               Plaintiff,

    v.

WARE DISPOSAL, INC., a California corporation; BJW Properties, LLC, a California limited liability company

           Defendants.

Civil Case No. 8:20-cv-1565

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)**

21
22
23
24
25
26
27
28

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through its counsel, alleges:

## I.     JURISDICTION AND VENUE

    1.    Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and

2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On June 11, 2020, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter ("Notice Letter") to Ware Disposal, Inc. ("Ware") and BJW Properties, LLC ("BJW") (collectively, "Defendants"), which is attached to this complaint as **Exhibit A** and incorporated here by reference. The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 1451 Manhattan Avenue, Fullerton, California 92831 ("Ware Disposal Facility" or "Facility"). The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.     The Notice Letter was also sent to the registered agent for Defendant, the Attorney General of the United States Department of Justice ("U.S. DOJ"), the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), the Acting Administrator of U.S. EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.     More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Plaintiff is informed and believes, and therefore alleges, that none of the State or Federal agencies has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5. Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.  INTRODUCTION

6. This complaint seeks relief for Defendants' unlawful discharges of pollutants into waters of the United States from their industrial operations at 1451 Manhattan Avenue, Fullerton, California 92831 (the "Facility"). Specifically, Defendants' discharge of pollutants from the Facility into Carbon Creek, which flows to Carbon Canyon Creek, Coyote Creek, San Gabriel River, and the Pacific Ocean (collectively referred to as the "Receiving Waters") in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring for at least five years from the date of the Notice Letter and are ongoing and continuous.

## III.  PARTIES

### A.  Orange County Coastkeeper.

7. Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

8. Coastkeeper has approximately over 1,350 members who live and/or recreate in and around the San Gabriel River watershed. Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself, its members, and others.

9.     Coastkeeper's members use and enjoy the San Gabriel River watershed and its tributaries, like Carbon Creek, for fishing, boating, swimming, bird watching, picnicking, wading, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, including monitoring and research activities, and/or for aesthetic enjoyment.

10.     Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to, discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the San Gabriel River watershed and its tributaries, and impair Coastkeeper's members' use and enjoyment of those waters.

11.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought through this complaint will redress the harms to Coastkeeper's members caused by Defendants' activities for which they have no other plain, speedy, or adequate remedy at law.

**B.     The Owner and/or Operator of the Facility.**

1.     Plaintiff is informed and believes, and therefore alleges that Ware Disposal is an active California Corporation.

2.     Plaintiff is informed and believes, and therefore alleges, that Ware Disposal, Inc. is an operator of the Facility.

3.     Plaintiff is informed and believes, and therefore alleges, that Ware Disposal has been operating the Facility for the past five years.

4.     Plaintiff is informed and believes, and therefore alleges, that Ware Disposal, Inc. is an owner of the Facility.

5.     Plaintiff is informed and believes, and therefore alleges, that Ware Disposal, Inc. has been an owner of the Facility for the past five years.

/ / /

6.      Plaintiff is informed and believes, and therefore alleges, that the name and address of the Registered Agent for Ware Disposal is Judith Helaine Ware, located at 1035 E. 4th Street, Santa Ana, California 92701.

7.      Plaintiff refers to Ware Disposal, Inc. within this complaint as the "Facility Owner and/or Operator."

8.      Plaintiff is informed and believes, and therefore alleges, that the Facility operates on land owned by BJW Properties, LLC ("BJW").

9.      Plaintiff is informed and believes, and therefore alleges, that the name and address of the Registered Agent for BJW is Judith Helaine Ware, located at 1035 E. 4th Street, Santa Ana, California 92701.

10.     Ware Disposal and BJW are collectively referred to within this complaint as "Defendants" and/or "Owners and/or Operator" of the Facility.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

11.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

12.     The Clean Water Act requires that point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

13.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

14.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel

or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

15.   The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

16.   "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

17.   The U.S. EPA has promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The U.S. EPA interprets "waters of the United States" to include not only traditionally navigable waters, but also other waters including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

18.   The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

19.   A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

20.   A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

21.   Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an

"effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

22.    Defendants are a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

23.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

24.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $58,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

25.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    California's Storm Water Permit.**

26.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

27.    Section 402(b) of the Clean Water Act allows each state to administer its own U.S. EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

/ / /

28.     California is a state authorized by U.S. EPA to issue NPDES permits.

29.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

30.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

31.     Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ (the "1997 Permit").

32.     On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued (the "2015 Permit").

33.     The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. *See* 2015 Permit, Finding 6.

34.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. 2015 Permit Finding #12. Before beginning industrial operations, dischargers must apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 2015 Permit, Finding 17.

35.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* 2015 Permit, Section XXI(A) (Duty to Comply).

**C.    The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

36.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* 2015 Permit, Discharge Prohibition III(B).

37.    The Storm Water Permit contains Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

38.    A TMDL is a calculation of the maximum quantity (or load) of a pollutant that may be added to a water body from all sources, including point sources, nonpoint sources, aerial deposition, and natural background sources, without exceeding the applicable Water Quality Standards ("WQS") for that or those pollutants. *See* 40 C.F.R. § 130.2(e); 33 U.S.C. § 1313(d)(1)(c); 40 C.F.R. § 130.2(e)-(i).

39.    A TMDL can be expressed as the sum of the wasteload allocations ("WLAs") and the load allocations, plus a margin of safety. The WLA is the portion of a TMDL allocated to known existing and future point sources. *See* 40 C.F.R. § 130.2(h).

40.    The Regional Board adopted the San Gabriel River Metals and Selenium TMDL ("Metals TMDL") to control water quality impairments in the San Gabriel River, Coyote Creek and its tributaries due to zinc, copper and lead.

41.    The Metals TMDL assigns a WLA for toxic pollutants including copper, lead and zinc to be met at the facility's industrial discharge location(s) for discharges into the San Gabriel River and Coyote Creek and its tributaries.

42.    The Metals TMDL assigned WLAs for copper, lead, and zinc to Responsible Dischargers, to be met at the facility's industrial discharge location(s). *See* 2015 Permit, Section (VII)(A)(1)-(3), Attachment E.

43.    WLAs were translated into instantaneous maximum Numeric Effluent Limitations ("NELs").

44.    The instantaneous maximum NEL applicable to discharges from the Ware Facility are: copper – 0.027 mg/L; lead – 0.106 mg/L; zinc – 0.158 mg/L. Effective July 1, 2020, Responsible Discharger with an NEL exceedance is in violation of the Storm Water Permit and must take corrective action. *See* 2015 Permit, Section (XX)(B).

45.     The Storm Water Permit's Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH. *See* 2015 Permit, Section V(A).

46.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 Permit, Effluent Limitation V(A).

47.     U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

48.     The U.S. EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

49.     The U.S. EPA Benchmarks for the following parameters are: Coliform, E. Coli – 320 MPN/100ml; Enterococcus – 110 MPN/100ml; TSS – 100 mg/L; iron – 1.0 mg/L; and aluminum – 0.75 mg/L. Additional U.S. EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from facilities.

/ / /

50.     Discharges from an industrial facility containing pollutant concentrations that exceed U.S. EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

51.     The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* 2015 Permit, Section VI(B).

52.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Receiving Water Limitations, Section VI(B) of the 2015 Permit.

53.     The Storm Water Permit's Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." *See* 2015 Permit, Receiving Water Limitation VI(A).

54.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and U.S. EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

55.     The State of California regulates water quality through the State Board and nine regional boards. Each regional board maintains a separate Water Quality Control Plan that includes WQS for water bodies within its geographical area.

56.     The Water Quality Control Plan for the San Gabriel River watershed, California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the Santa Ana River region.

57.     The Beneficial Uses for Carbon Creek include: Groundwater Recharge; Non-contact Water Recreation; Wildlife Habitat; and intermittent Beneficial Use

1   designations for Water Contact Recreation, Warm Freshwater Habitat, and Municipal and
2   Domestic Supply. *See* Basin Plan at Table 3-1.

3       58.    The existing, potential and intermittent Beneficial Uses for Carbon Creek
4   downstream of the segment within the Regional Board's jurisdiction identified in the
5   Santa Ana Basin Plan include: Municipal Supply; Warm Freshwater Habitat; and
6   Wildlife Habitat. *See* Basin Plan at Table 3-1.

7       59.    Carbon Creek flows into Carbon Canyon Creek, which flows into Coyote
8   Creek, a tributary of the San Gabriel River. The existing, potential and intermittent
9   Beneficial Uses for Coyote Creek include: Municipal Supply; Industrial Service Supply;
10  Industrial Process Supply; Warm Freshwater Habitat; Wildlife Habitat; and Rare,
11  Threatened or Endangered Species Habitat. *Id.*

12      60.    The existing, potential and intermittent Beneficial Uses for the San Gabriel
13  River include: Industrial Service Supply; Freshwater Replenishment; Commercial and
14  Sport Fishing; Estuarine Habitat; Marine Habitat; Wildlife Habitat; Rare, Threatened or
15  Endangered Species; Migration of Aquatic Organisms; Spawning, Reproduction and/or
16  Early Development; and Shellfish Harvesting. *Id.*

17      61.    Surface waters that cannot support the Beneficial Uses of those waters listed
18  in basin plans are designated as impaired water bodies pursuant to Section 303(d) of the
19  Clean Water Act, 33 U.S.C. § 1313(d).

20      62.    According to the 2016 303(d) List of Impaired Water Bodies, Coyote Creek
21  is impaired for dissolved copper, indicator bacteria, iron, malathion, pH, and toxicity.

22      63.    The San Gabriel River Estuary is impaired for copper, dioxin, indicator
23  bacteria, nickel, and dissolved oxygen.

24      64.    The Pacific Ocean at Seal Beach is impaired for indicator bacteria and
25  PCBs. The San Pedro Bay Near/Off Shore Zones are impaired for chlordane, PCBs, Total
26  DDT, and toxicity.

27      65.    Alamitos Bay is listed as impaired for indicator bacteria and dissolved
28  oxygen.

66.     Polluted discharges from bin repair facilities, such as the Ware Disposal Facility, contain pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead and zinc; chemical oxygen demand ("COD"); Total Suspended Solids ("TSS"); Nitrate plus Nitrite ("N+N"); indicator bacteria; trash; and oil and grease ("O&G"), each of which causes or contributes to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

67.     Discharges of pollutants at levels above WQS, like those from the Ware Disposal Facility, cause or contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

68.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan, the Water Quality Control Plan – Ocean Waters of California ("California Ocean Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

69.     The WQS from the California Ocean Plan for fecal coliform density for marine waters is a single sample maximum of 400/100 mL. *See* California Ocean Plan, at 4-5 (Rev. 2019).

70.     The WQS for enterococci for water contact in ocean waters has a statistical threshold value (highest value) of 110 cfu/100 mL. *Id*. at 5.

71.     The Basin Plan provides that "inland surface waters shall not contain suspended or settleable solids ("TSS") in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors." *See* Basin Plan, 4-19.

72.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Basin Plan, 4-18.

/ / /

73.     The Basin Plan includes a toxicity standard which states that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Basin Plan, 4-20.

74.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at:

http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

75.     Discharges with pollutant levels in excess of the CTR criteria, Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations, Section VI(A) of the 2015 Permit.

**D.      The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

76.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and from authorized non-storm water discharges from the facility. 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 2015 Permit, Section I(D) (Finding 32), Section X(C).

77.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description

of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit, Section X.

78.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 2015 Permit, Section X.

79.    The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit, Section X(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit, Section XV.

80.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

/ / /

E.    **The Storm Water Permit's Monitoring Implementation Program Requirements.**

81.    The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. 2015 Permit, Sections X(I) and XI.

82.    The MIP's objective is to detect and measure the concentrations of pollutants in a facility's discharge and ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. See 2015 Permit, Section XI. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id.*

83.    The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the 2015 Permit. 2015 Permit, Section XI(B).

84.    Section XI(A)(1) of the 2015 Permit requires dischargers to conduct monthly visual observations of each drainage area.

85.    Section XI(A)(2) of the 2015 Permit requires dischargers to conduct sampling event visual observations and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 2015 Permit, Section XI(A)(3).

86.    The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 2015 Permit, Section X(B)(1).

87.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 2015 Permit Section XI(B)(4).

88.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

89.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

90.     Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples to the State via the State Board's Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

91.     Section XI(B)(6)(a)-(b) of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code.

92.     Table 1 of the 2015 Permit requires SIC code 3441, such as this facility, to analyze samples for zinc, N+N, iron, and aluminum.

93.     Section XI(B)(6)(c) of the 2015 Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

94.     Section XI(B)(6)(f) of the 2015 Permit requires dischargers to analyze additional parameters as required by the regional boards.

95.     Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads.

96.     Section XVI of the 2015 permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements, of the 2015 Permit; an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist; an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year; and the date(s) of the Annual Evaluation.

**F.     The 2015 Permit's Exceedance Response Action Requirements.**

97.     When the 2015 Permit became effective on July 1, 2015, all permittees began its term in "Baseline status." See 2015 Permit, Section XII(B). Under the Permit, a facility's Baseline status changes to "Level 1 status" if sampling results indicate a Numeric Action Level ("NAL") exceedance for one or more parameters. *See* 2015 Permit, Section XII(C).

98.     If an exceedance occurs, a facility's Level 1 status commences on July 1 following the reporting year during which it occurred. *See* 2015 Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* 2015 Permit, Section XII(C)(1)(a)-(c).

99.     Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, the facility shall evaluate all drainage areas. *See* 2015 Permit, Section XII(C)(1)(c).

100.    Based upon its Level 1 status evaluation, the permitted facility is required to revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation; and certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA

Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. The SWPPP revision must be done as soon as practicable but no later than January 1 after the facility reaches Level 1 status. *See* 2015 Permit, Section XII(C)(2)(a)(i)-(ii).

101.   A permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address), also no later than January 1 following commencement of Level 1 status. *See* 2015 Permit, Section XII(C)(2)(a)(iii).

102.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII(C)(2)(b).

103.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2015 Permit, Section XII(D).

104.   A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, 2015 Permit, Section XII(D).

## V.      FACTUAL BACKGROUND

### A.      The Facility's Storm Water Permit Coverage.

105.   Plaintiff is informed and believes, and based upon that belief alleges, that on or about March 11, 2015, Ware Disposal obtained Storm Water Permit coverage for the Facility by submitting a Notice of Intent ("NOI") to the State Board.

106. Plaintiff is informed and believes, and based upon that belief, alleges that the NOI identified the owner/operator of the Ware Disposal Facility as "Ware Disposal, Inc." located at 1451 Manhattan Ave., Fullerton, California 92831.

107. The NOI lists the Facility as 2.5 acres in size with 2 acres of industrial area exposed to storm water.

108. The NOI states that the Facility is 20% impervious.

109. The State Board's electronic SMARTS database lists the current Ware Disposal Facility Waste Discharge Identification ("WDID") number as 8 30I024370.

110. SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

111. The NOI lists the SIC code for the Facility as 4953 (Refuse Systems).

**B.     Description of Industrial Activities at the Facility.**

112. Based upon information available to Coastkeeper, including the Facility SWPPP describing vehicle and equipment maintenance and storage at the Facility, Plaintiff believes, and therefore alleges, that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) and/or 4212 (maintenance) also apply to the Facility.

113. Plaintiff is informed and believes and, based upon that belief, alleges that the Facility provides residential solid waste and recycling services.

114. Plaintiff is informed and believes and, based upon that belief, alleges that the areas of industrial activity at the Facility include a maintenance bay, welding area and paint booth, container storage areas, scrap storage and repair areas, and fueling stations for large vehicles.

115. Plaintiff is informed and believes and, based upon that belief, alleges that industrial activities at the Facility include, but are not limited to: maintenance and repair of trash bins and waste-hauler vehicles, storage of empty trash/recycling bins, washing of trash and recycling bins, CNG fueling of trash waste-hauler vehicles, vehicle maintenance, welding, and painting.

116.   Plaintiff is informed and believes and, based upon that belief, alleges that pollutants associated with industrial activities at the Facility include, but are not limited to: pH-affecting substances, heavy metals including copper, lead, and zinc, spent abrasive grits, anti-corrosive compounds, paint chips, scrap metal, welding rods, PCBs, hydraulic fluids, flame retardants, lubricants, paints, dyes, sealants, trash, indicator bacteria, oil and grease, sediment and other suspended solids, and nutrients.

117.   Plaintiff is informed and believes and, based upon that belief, alleges that pollutants have been and continue to be tracked throughout the facility by vehicles and machinery, and that these pollutants are tracked outside of the Facility and accumulate on the driveway, sidewalk, and street outside of the Facility.

118.   Plaintiff is informed and believes and, based upon that belief, alleges that trash and recycling bins and vehicles are stored outside without adequate cover or containment, resulting in discharges of polluted storm water.

119.   Plaintiff is informed and believes and, based upon that belief, alleges that storage of metal parts and hazardous materials associated with maintenance, and washing of the bins and vehicles, occur outside without secondary containment or other measures to prevent polluted storm water and prohibited non-storm water discharges from discharging from the Facility.

120.   Plaintiff is informed and believes, and based upon that belief alleges that the Facility's Owners' and/or Operator's failures to develop and/or implement required BMPs result in the exposure of pollutants associated with their industrial activities to precipitation, and result in the Facility's discharge of polluted storm water into Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

121.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility's Owners' and/or Operators' failures to develop and/or implement required BMPs also result in discharges of prohibited non-storm water in violation of the Storm Water Permit and the Clean Water Act.

122.   Plaintiff is informed and believes, and thereon alleges, that that the activities and/or areas listed in paragraphs 100-107 are industrial activities and/or areas of industrial activity at the Facility.

**C.     Defendant's SWPPP and MIP for the Facility.**

123.   The SWPPP and MIP are publicly available for the Ware Disposal Facility via the SMARTS database and are dated July 14, 2015.

124.   Plaintiff is informed and believes and, based upon that belief, alleges that the SWPPP and MIP referenced in paragraph 124 is the current SWPPP and MIP for the Facility.

**D.     Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Facility.**

125.   Plaintiff is informed and believes and, based upon that belief, alleges that the industrial activities and areas of industrial activity are sources of pollutants at the Facility.

126.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas at the Facility include, but are not limited to, the activities described in paragraphs 105-122.

127.   The Ware Disposal Facility's SWPPP Sections entitled: "Facility Description," and "Description of Potential Pollutant Source" provide brief descriptions of the areas where industrial activities are conducted at the Facility.

128.   Plaintiff is informed and believes and, based upon that belief, alleges that a Ware Disposal Facility site map ("Site Map") was uploaded to SMARTS on July 23, 2015, and that the Site Map is a map of the Ware Disposal Facility submitted pursuant to Section II(B)(3)(a) of the 2015 Permit.

129.   Plaintiff is informed and believes and, based upon that belief, alleges that the SWPPP for the Facility and the Site Map fail to identify any discharge points at the Facility.

/ / /

130.   Plaintiff is informed and believes and, based upon that belief, alleges that the SWPPP for the Facility and the Site Map fail to describe or depict the direction of storm water flows at the Facility.

131.   Plaintiff is informed and believes and, based upon that belief, alleges that the SWPPP's pollutant source assessment indicates that metals, including copper, lead, tin and zinc, are present on site in the welding area and paint booth, but then fails to include those pollutants in its monitoring plan.

132.   The Ware Disposal Facility's SWPPP sections entitled: "Best Management Practices" identify the BMPs for the areas of industrial activity at the Facility.

133.   Plaintiff is informed and believes and, based upon that belief, alleges that BMPs that achieve BAT/BCT have not been implemented at the Facility. For example, storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above the benchmark levels established by U.S. EPA.

134.   Courts have expressly held that the U.S. EPA Benchmarks are relevant objective standards to evaluate whether BMPs implemented by a permittee achieve effluent limitations. See *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 924 (C.D. Cal. 2009) (holding that "EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs").

135.   Plaintiff is informed and believes, and thereon alleges, that the ongoing exceedances of NALs for iron, aluminum, and TSS as explained in Exhibit 1 demonstrate that Defendants have failed, and continue to fail, to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

136.   Ware Disposal's failure to develop and/or implement adequate pollution controls to meet BAT/BCT at the Facility violates, and will continue to violate, the CWA and the Storm Water Permit each and every day.

/ / /

### E.  Discharge Locations at the Facility

#### a.  Discharge Locations at the Ware Disposal Facility

137.  In the Facility's SWPPP, the Facility Owners and/or Operators report that all discharge locations are identified in the site map attached as Appendix A. However, the site map does not contain any discharge locations, nor does it indicate flow direction within the facility.

138.  Based on Coastkeeper's observations, storm water sheet flows out of the driveways at the Facility. Water then flows south into a municipal storm drain.

139.  The Facility SWPPP states that there is a clarifier in the northwest corner of the Facility maintained by American Oil Company that receives some stormwater flow and may discharge pollutants.

### F.  The Discharges from the Facility to the Receiving Waters

140.  Plaintiff is informed and believes and, based upon that belief, alleges that the polluted storm water discharging from the Ware Disposal Facility flows from the municipal storm sewer system into Carbon Creek, which flows into Carbon Canyon Creek, then Coyote Creek – a tributary of the San Gabriel River.

141.  Plaintiff is informed and believes and, based upon that belief, alleges that the polluted storm water from the Facility discharges from the San Gabriel River to the Pacific Ocean between the cities of Long Beach and Seal Beach. Coastkeeper refers to these surface waters collectively as the "Receiving Waters."

142.  Plaintiff is informed and believes, and thereon alleges, that each of the receiving waters described in paragraphs 140 and 141 are waters of the United States.

143.  In addition to implementing technology-based controls, the Storm Water Permit and the Clean Water Act prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of applicable water quality standards ("WQS"). *See* 2015 Permit Section VI(A); 33 U.S.C. § 1311 (b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

144.   Applicable WQS include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), the California Ocean Plan, and water quality objectives in the Basin Plan.

145.   The Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health" and that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Basin Plan 4-20.

146.   The Basin Plan also includes applicable narrative WQS. *See*, generally, Basin Plan, Ch. 4-20.

147.   The WQS from the California Ocean Plan for fecal coliform density for marine waters is a single sample maximum of 400/100 mL. *See* California Ocean Plan, at 4-5 (Rev. 2019).

148.   The WQS for enterococci for water contact in ocean waters has a statistical threshold value (highest value) of 110 cfu/100 mL. *Id*. at 5.

149.   On March 10, 2020, Coastkeeper collected a sample from the Facility where the reported concentration of fecal coliform was 170,000 MPN/100 mL and enterococci was greater than 240,000 MPN/100 mL.

150.   On April 6, 2020, Coastkeeper collected a sample from the Facility where the reported concentration of fecal coliform and enterococci were both greater than 240,000 MPN/100 mL and exceeded the testing limits.

151.   As explained herein, the Receiving Waters are impaired, and thus are unable to support the designated beneficial uses for some of the same pollutants discharging from the Facility. The 2016 303(d) List of Impaired Water Bodies lists the Receiving Waters as impaired for multiple pollutants, including indicator bacteria and iron.

/ / /

/ / /

152.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility's discharges include indicator bacteria and iron that contribute to the impairment of the Receiving Waters and cause exceedances of these WQS. These discharges also adversely impact human health or the environment, in violation of Receiving Water Limitation VI(B) of the Storm Water Permit.

153.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI(A) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

154.   Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI(B) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

155.   The Storm Water Permit's Receiving Water Limitations are violated each time polluted storm water is discharged from the Facility. These discharge violations are ongoing and will continue every time these discharges occur.

156.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation VI.A. of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### G.    Non-Storm Water Discharges.

157.   Plaintiff is informed and believes and, based upon that belief, alleges that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

158.   Plaintiff is informed and believes and, based upon that belief, alleges that unauthorized non-storm water discharges are ongoing and will continue until the Facility Owners and/or Operator develop and implement BMP's that prevent prohibited on-storm water discharges or obtain separate NPDES permit coverage.

159.   Plaintiff is informed and believes and, based upon that belief, alleges that unauthorized non-storm water discharges occur as a result of bin washing and cleaning activities at the Ware Disposal Facility.

160.   The Facility Owners and/or Operator conduct the activities described at above without BMPs to prevent related non-storm water discharges.

161.   Non-storm water discharges resulting from the activities described at above are not from sources that are listed among the authorized non-storm water discharges in Special Conditions and are always prohibited under the Storm Water Permit.

**H.    Defendant's Sampling, Monitoring, and Reporting**

162.   The Ware Disposal Facility's SWPPP states that the SWPPP's Monitoring Program satisfies the Storm Water Permit's requirement for a Monitoring Implementation Plan (MIP).

163.    Plaintiff is informed and believes and, based upon that belief alleges that the Facility Owners and/or Operator has been conducting, and continue to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

164.   Section XI(B)(3) of the 2015 Permit, dischargers are required to collect and analyze storm water samples from two Qualifying Storm Events ("QSE") within the first half of each reporting year (July 1st to December 31st) and two QSEs within the second half of each reporting year (January 1st to June 30th).

165.   Plaintiff is informed and believes and, based upon that belief, alleges that the MIP for the Facility fails to require that the Facility Owners and/or Operator collect storm water samples from all discharge locations at the Facility from all storm water discharges occurring during qualifying storm events.

166.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility has not collected a single storm water sample since July 1, 2015.

167.   Ware Disposal Facility's SWPPP section entitled Sampling and Analysis Procedures constitutes the "Sampling Program" for the Facility.

168.   The SWPPP Sampling and Analysis Procedures section identifies O&G, TSS, pH, and Iron as the parameters required for sampling at the Facility.

169.   Plaintiff is informed and believes and, based upon that belief, alleges that the industrial activities at the Facility result in the discharge of storm water containing indicator bacteria to receiving waters impaired for indicator bacteria, contributing to the degradation of water quality.

170.   Plaintiff is informed and believes, and based upon that belief alleges that the Facility's SWPPP fails to meet the requirement for the Facility Owners and/or Operator to analyze storm water discharges from the Facility for all required parameters by failing to specify that storm water discharges will be analyzed for indicator bacteria.

171.   Via the SMARTS database, Plaintiff obtained an annual report for the Ware Disposal Facility dated August 1, 2016. Plaintiff is informed and believes and, based upon that belief, alleges that the Annual Report dated August 1, 2016 is the 2015/2016 Annual Report for the Ware Disposal Facility.

172.   Via the SMARTS database, Plaintiff obtained an annual report for the Ware Disposal Facility dated July 10, 2017. Plaintiff is informed and believes and, based upon that belief, alleges that the Annual Report dated July 10, 2017 is the 2016/2017 Annual Report for the Ware Disposal Facility.

173.   Via the SMARTS database, Plaintiff obtained an annual report for the Ware Disposal Facility dated July 13, 2018. Plaintiff is informed and believes and, based upon that belief, alleges that the Annual Report dated July 13, 2018 is the 2017/2018 Annual Report for the Ware Disposal Facility.

174.   Via the SMARTS database, Plaintiff obtained an annual report for the Ware Disposal Facility dated August 14, 2019. Plaintiff is informed and believes and, based upon that belief, alleges that the Annual Report dated August 14, 2019 is the 2018/2019 Annual Report for the Ware Disposal Facility.

175.   Via the SMARTS database, Plaintiff obtained an annual report for the Ware Disposal Facility dated July 15, 2020. Plaintiff is informed and believes and, based upon

that belief, alleges that the Annual Report dated July 15, 2020 is the 2019/2020 Annual Report for the Ware Disposal Facility.

2015/2016 Reporting Year

176.   Plaintiff is informed and believes and, based upon that belief, alleges that during the 2015/2016 reporting year, the Facility Owners and/or Operator failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facilities storm water discharges in significant quantities, such as indicator bacteria.

177.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to conduct and/or record all storm water visual observations during the 2015/2016 reporting year.

178.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2015/2016 reporting year.

179.   Plaintiff is informed and believes and, based upon that belief, alleges that the 2015/2016 Annual Report states that no samples were taken because there are no sampling discharge points on site.

180.   Plaintiff is informed and believes and, based upon that belief, alleges that Coastkeeper's samples taken in 2020 demonstrate that there are at least two discharge points at the Facility. Since the Ware Disposal Facility's SWPPP has not been updated to reflect any changes to storm water flow since 2015, it can be assumed that there were discharge points to sample during the 2015/2016 reporting year.

181.   Plaintiff is informed and believes and, based upon that belief, alleges that in its 2015/2016 Annual Report, the Facility Owners and/or Operator certified that the Facility was in compliance with the Storm Water Permit.

182.   Plaintiff is informed and believes and, based upon that belief, alleges that in its 2015/2016 Annual Report, the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility.

183.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners' and/or Operator's certification of compliance in the 2015/2016 Annual Report was false because the Facility failed to comply with each of the 2015 Permit's requirements.

2016/2017 Reporting Year

184.   Plaintiff is informed and believes and, based upon that belief, alleges that during the 2016/2017 reporting year, the Facility Owners and/or Operator failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities, such as indicator bacteria.

185.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to conduct and/or record all storm water visual observations during the 2016/2017 reporting year.

186.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2016/2017 reporting year.

187.   Plaintiff is informed and believes, and based upon that belief, alleges that the 2016/2017 Annual Report states that no samples were taken because there are no sampling discharge points on site.

188.   Plaintiff is informed and believes and, based upon that belief, alleges that Coastkeeper's samples taken in 2020 demonstrate that there are at least two discharge points at the Facility. Since the Ware Disposal Facility's SWPPP has not been updated to reflect any changes to storm water flow since 2015, it can be assumed that there were discharge points to sample during the 2016/2017 reporting year. Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2016/2017 Annual Report.

189.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2016/2017 Annual Report.

190.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners' and/or Operator's certification of compliance in the 2016/2017 Annual Report was false because the Facility failed to comply with each of the requirements of the 2015 Permit.

2017/2018 Reporting Year

191.   Plaintiff is informed and believes and, based upon that belief, alleges that during the 2017/2018 reporting year, the Facility Owners and/or Operator failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities, such as indicator bacteria.

192.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2017/2018 reporting year.

193.   Plaintiff is informed and believes and, based upon that belief, alleges that the 2017/2018 Annual Report states that no samples were collected this reporting year because there was not sufficient runoff.

194.   Plaintiff has obtained climatological data from the National Oceanic and Atmospheric Administration ("NOAA") which demonstrates that sufficient rainfall occurred at the Facility to afford Defendants additional opportunities to sample significant rain events during the 2017/2018 reporting year.

195.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2017/2018 Annual Report.

/ / /

196.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2017/2018 Annual Report.

197.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners' and/or Operator's certification of compliance in the 2017/2018 Annual Report was false because the Facility failed to comply with each of the requirements of the 2015 Permit.

2018/2019 Reporting Year

198.   Plaintiff is informed and believes and, based upon that belief, alleges that during the 2018/2019 reporting year, the Facility Owners and/or Operator failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities, such as indicator bacteria.

199.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to conduct and/or record all storm water visual observations during the 2018/2019 reporting year.

200.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2018/2019 reporting year.

201.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2018/2019 Annual Report.

202.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2018/2019 Annual Report.

/ / /

203.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners' and/or Operator's certification of compliance in the 2018/2019Annual Report was false because the Facility failed to comply with each of the requirements of the 2015 Permit.

2019/2020 Reporting Year

204.   Plaintiff is informed and believes and, based upon that belief, alleges that during the 2019/2020 reporting year, the Facility Owners and/or Operator failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities, such as indicator bacteria.

205.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to conduct and/or record all storm water visual observations during the 2019/2020 reporting year.

206.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2019/2020 reporting year.

207.   Plaintiff is informed and believes and, based upon that belief, alleges that the 2019/2020 Annual Report states that no samples were taken because the Facility utilized gravel bags around the perimeter that did not allow stormwater to discharge from the Facility.

208.   Plaintiff is informed and believes and, based upon that belief, alleges that samples taken by Coastkeeper on March 10, 2020 and April 6, 2020 confirming high quantities of indicator bacteria demonstrate that stormwater discharged from the Facility in sufficient quantities for sampling to occur.

209.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2018/2019 Annual Report.

210.   Plaintiff is informed and believes and, based upon that belief, alleges that that the Facility Owners and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2018/2019 Annual Report.

211.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners' and/or Operator's certification of compliance in the 2019/2020 Annual Report was false because the Facility failed to comply with each of the requirements of the 2015 Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

212.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

213.   Plaintiff is informed and believes and, based upon that belief, alleges that Defendant has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

214.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

215.   Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

216.   The Facility Owners and/or Operator have violated and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

217.   The Facility Owners and/or Operator have been in violation of the Storm Water Permit at the Facility every day from July 1, 2015 to the present.

218.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

219.   Each and every violation of the Storm Water Permit's Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

220.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

221.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

222.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

/ / /

/ / /

1

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation**
**of Storm Water Permit's Receiving Water Limitations**
**and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

223.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

224.   Plaintiff is informed and believes and, based upon that belief, alleges that within the applicable statute of limitations, discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

225.   Plaintiff is informed and based upon that belief, alleges that within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged, and continues to discharge, each time storm water discharges from the Facility.

226.   The Facility Owners and/or Operator has violated and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

227.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator has the Storm Water Permit's Receiving Water Limitations and the CWA within the applicable statute of limitations, and such violations are ongoing and continuous.

228.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

229.   By committing the acts and omissions alleged above, the Facility Owners and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

230.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

231.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION

**Defendants' Discharges of Non-Storm Water in Violation of the**

**Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

232.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

233.   Plaintiff is informed and believes and, based upon that belief, alleges that the Facility Owners and/or Operator have violated the Storm Water Permit's Discharge Prohibitions, within the applicable statute of limitations, and such violations are ongoing and continuous.

234.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

/ / /

235.   By committing the acts and omissions alleged above, the Facility Owners and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

236.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

237.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

238.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

239.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners and/or Operator have failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

240.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners and/or Operator have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

/ / /

241.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners and/or Operator have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

242.   The Facility Owners and/or Operator have been in violation of the Storm Water Permit at the Facility every day from July 1, 2015 to the present.

243.   These violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

244.   The Facility Owner and/or Operator will continue to be in violation of the Storm Water Permit and the CWA each and every day the Facility Owners and/or Operator fails to adequately develop, implement, and/or revise the SWPPPs for the Facility.

245.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

246.   By committing the acts and omissions alleged above, the Facility Owners and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

247.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

248.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

/ / /

**FIFTH CAUSE OF ACTION**

**Defendants' Failure to Adequately Develop, Implement, and/or**

**Revise a Monitoring Implementation Program in Violation of the**

**Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

249.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

250.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners and/or Operator have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

251.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners and/or Operator have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the Storm Water Permit.

252.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners and/or Operator have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

253.   The Facility Owners and/or Operator have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from July 1, 2015 to the present.

254.   The Facility Owner's and/or Operator's violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

255.   The Facility Owner and/or Operators will continue to be in violation of Section XI of the 2015 Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the MIP for the Facility.

256.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

257.   By committing the acts and omissions alleged above, the Facility Owners and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

258.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

259.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Defendants' Failure to Report as Required by the Storm Water**

**Permit in Violation of the Storm Water Permit**

**and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

260.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

261.   Plaintiff is informed and believes and, based upon that belief, alleges within the applicable statute of limitations, that the Facility Owners' and/or Operator's 2015/2016 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

/ / /

262.   Plaintiff is informed and believes and, based upon that belief alleges, within the applicable statute of limitations, that the Facility Owners' and/or Operator's 2016/2017 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

263.   Plaintiff is informed and believes and, based upon that belief alleges, within the applicable statute of limitations, that Facility Owners' and/or Operator's 2017/2018 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

264.   Plaintiff is informed and believes and, based upon that belief alleges, within the applicable statute of limitations, that Facility Owners' and/or Operator's 2018/2019 Annual Report fails to meet the requirements of Section XVI(B) of the 2015 Permit.

265.   The Facility Owners and/or Operator have been in violation of Section XVI of the 2015 Permit and the CWA every day since at least July 1, 2015.

266.   The Facility Owners' and/or Operator's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

267.   By committing the acts and omissions alleged above, the Facility Owners and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

268.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

269.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

/ / /

/ / /

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

270.    Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring the Defendants to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failure to develop and implement and adequate SWPPP, for failure to develop and implement an adequate MIP, for failure to submit accurate annual reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit.

b.      A Court order enjoining Defendants from discharging pollutants without an NPDES permit;

c.      A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.      A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per violation per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $58,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

e.      A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

1    f.    Any other relief as this Court may deem appropriate.

2

3    Dated: August 21, 2020                Respectfully submitted,

4

5                                          By __Jennifer F. Novak_____

6                                             Jennifer F. Novak
                                              Attorney for Plaintiff
7                                             Orange County Coastkeeper

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28